# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **SUSAN S. OSBORNE,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:11cv00017 |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **REPORT AND RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Susan S. Osborne, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

-1-

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Osborne protectively filed her applications for DIB and SSI on October 9, 2007, alleging disability as of February 16, 2007, due to anxiety, panic attacks, bipolar disorder, neck and left arm injuries and "nerves." (Record, ("R."), at 154-60, 194, 209, 233.) The claims were denied initially and on reconsideration. (R. at 102-04, 108, 111-17, 119-20.) Osborne then requested a hearing before an administrative law judge, ("ALJ"). (R. at 121.) A hearing was held on July 14, 2009, at which Osborne was represented by counsel. (R. at 40-97.)

By decision dated November 3, 2009, the ALJ denied Osborne's claims. (R. at 19-35.) The ALJ found that Osborne met the nondisability insured status requirements of the Act for DIB purposes through the date of the decision. (R. at 33.) The ALJ also found that Osborne had not engaged in substantial gainful activity since February 16, 2007, the alleged onset date. (R. at 33.) The ALJ determined that the medical evidence established that Osborne had severe impairments, namely neck pain, history of supraventricular tachycardia status-post successful ablation, gastrointestinal problems, bipolar disorder, without agoraphobia, alcohol dependence in early full remission, personality disorder and borderline intellectual functioning, but she found that Osborne did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404,

-2-

Subpart P, Appendix 1. (R. at 23, 26, 33.) The ALJ also found that Osborne had the residual functional capacity to perform simple, noncomplex medium[1] work that required a temperature-controlled environment with access to a bathroom, that did not require overhead lifting, more than frequent bending, stooping, kneeling, balancing, crouching and crawling or that required her to work interactively and cooperatively with other co-workers. (R. at 34.) The ALJ found that Osborne was unable to perform her past relevant work as a certified nurse's assistant, ("CNA"). (R. at 32, 34.) Based on Osborne's age, education, work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that she could perform, including jobs as a hospital cleaner, a house worker and a laundry worker. (R. at 32-34.) Thus, the ALJ found that Osborne was not under a disability as defined under the Act and was not eligible for benefits. (R. at 34.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2011).

After the ALJ issued her decision, Osborne pursued her administrative appeals, (R. at 153), but the Appeals Council denied her request for review. (R. at 1-6.) Osborne then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2011). The case is before this court on Osborne's motion for summary judgment filed September 19, 2011, and the Commissioner's motion for summary judgment filed November 18, 2011.

---

[1] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2011).

-3-

## II. Facts

Osborne was born in 1967, (R. at 154, 158), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Osborne completed the ninth grade and has past relevant work experience as a CNA. (R. at 65, 67, 215.) Osborne testified that she worked as a CNA for eight to nine years. (R. at 67.) She stated that she quit school because she was pregnant. (R. at 65.) Osborne testified at her hearing that her medications helped with her bipolar disorder. (R. at 62.)

James Williams, a vocational expert, was present and testified at Osborne's hearing. (R. at 91-95.) Williams classified Osborne's past work as a CNA as semi-skilled, medium work. (R. at 91.) Williams was asked to assume a hypothetical individual of Osborne's age, education and work experience who had the residual functional capacity to perform simple, noncomplex medium work, who could not work around the general public, who could work with others in the work area or work environment, but could not work interactively or cooperatively with others, who required a temperature-controlled environment with access to a bathroom and who could not perform overhead lifting. (R. at 92-93.) Williams stated that such an individual could not perform Osborne's past work as a CNA. (R. at 93.) He stated that there were other jobs available that existed in significant numbers in the national economy that such an individual could perform, including jobs as a hospital cleaner, a house worker and a laundry worker. (R. at 93-94.) Williams was asked to consider the same individual, but who had marked limitations in her ability to handle work stresses and to demonstrate reliability. (R. at 95.) He stated that there would be no jobs available that such an individual could perform. (R. at

-4-

95.)

In rendering her decision, the ALJ reviewed records from Scott County Public Schools; Cardiovascular Associates, P.C.; Wellmont Holston Valley Medical Center; Frontier Health; Louis Perrott, Ph.D., a state agency psychologist; Dr. Frank M. Johnson, M.D., a state agency physician; E. Hugh Tenison, Ph.D., a state agency psychologist; and B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist. Osborne's attorney also submitted medical records from Wellmont Holston Valley Medical Center; Kingsport Medical Center; Scott County Mental Health Center; Clinch River Health; Dr. Michael Sullivan, M.D.; Indian Path Medical Center; and University of Virginia Health Systems to the Appeals Council.[2]

On March 14, 1979, when Osborne was 11 years old, Richard Gibson, a certified school psychologist, administered the Wechsler Intelligence Scale for Children, ("WISC"), which showed verbal and full-scale IQ scores in the mild mentally retarded range, and a performance IQ score in the borderline defective range. (R. at 430.) Gibson noted that teacher comments indicated that Osborne was anxious, easily confused, limited verbally and had a short-attention span. (R. at 429.) Gibson also administered the Wide Range Achievement Test, ("WRAT"), which revealed that Osborne was functioning over three years below grade level in reading and spelling and almost one-and-a-half years behind in math. (R. at 430.)

---

[2] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 1-6), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

Gibson opined that test results indicated that Osborne was functioning in or near the retarded range in almost all intellectual and academic areas, and he recommended that she be considered for educable mentally retarded, ("EMR"), placement and remedial classes. (R. at 430.) On November 7, 1983, when Osborne was 16 years old, Gibson administered the Wechsler Adult Intelligence Scale Revised, ("WAIS-R"), which produced verbal, performance and full-scale IQ scores in the borderline defective range. (R. at 431-32.) The WRAT was administered, which revealed that Osborne was functioning more than five years below grade level in reading and math and six years below grade level in spelling. (R. at 432.) Gibson reported that test results showed that Osborne was "functioning in or very near the retarded range in almost all intellectual and academic areas." (R. at 433.) He recommended that Osborne remain in the EMR resource program. (R. at 433.)

On July 21, 2007, Osborne presented to the emergency room at Wellmont Holston Valley Medical Center with complaints of facial pain following an alleged assault. (R. at 286-88.) Osborne requested pain medication, and it was noted that she smelled of alcohol. (R. at 287.) A staff member witnessed Osborne taking "a handful of medications" prior to being seen. (R. at 287.) Osborne was hesitant to allow nursing to be in the room during a urine collection, and she refused to give a urine specimen for a drug screen. (R. at 287.) A CT scan of Osborne's head showed a small benign cerebellar calcification and left nasal arch fracture. (R. at 287, 290.) A CT scan of Osborne's brain was negative. (R. at 289-90.) A CT scan of Osborne's cervical spine was normal. (R. at 287, 291.) She was diagnosed with left-sided facial contusion and left nasal arch fracture. (R. at 287.) On October 17, 2007, Osborne presented to the emergency room with complaints of neck pain. (R.

-6-

at 280.) On October 21, November 4, and November 14, 2007, Osborne presented to the emergency room with complaints of abdominal pain. (R. at 275, 279, 454-55.) On November 4, 2007, a CT scan of Osborne's pelvis and abdomen showed subsegemental atelectasis[3] versus early pneumonitis in one lobe, thickening of the pyloric canal resulting from peristaltic activity or gastritis, no gallbladder abnormality and a probable ovarian cyst. (R. at 277-78.) Osborne was sent for an endoscopy, which demonstrated normal results. (R. at 439, 451.) A November 27, 2007, abdominal MRI also was unremarkable. (R. at 441, 446.) On August 5, 2008, Osborne presented to the emergency room with complaints of chest pressure. (R. at 443-44.) A chest x-ray showed no abnormality. (R. at 445.) Osborne was diagnosed with anxiety/panic attack. (R. at 444.)

On August 31, 2007, Osborne presented to Frontier Health for mental health services. (R. at 329-46.) On September 13, 2007, Polly Easterling, B.S.W., found that Osborne had somewhat pressured speech and scattered thoughts, but she had euthymic mood, friendly and appropriate interactions and casual dress with good hygiene. (R. at 320.) Osborne reported that she wanted to work, but no one would hire her. (R. at 320.) Easterling reported that Osborne appeared to be stable. (R. at 320.) On October 8, 2007, Dr. James M. Turnbull, M.D., a psychiatrist, diagnosed bipolar disorder, mixed episode. (R. at 372.) Dr. Turnbull assessed Osborne's then-current Global Assessment of Functioning score, ("GAF"),[4] at 55.[5] (R. at 372.) He

---

[3] Atelectasis is defined as the absence of gas from all or part of the lungs, due to failure of expansion or resorption of gas from the alveoli. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 72 (1995).

[4] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32

reported that treatment was expected to improve the health status or functioning of Osborne. (R. at 372.)

On October 29, 2007, Osborne reported to Easterling that her medication was working well. (R. at 325.) On November 12, 2007, Osborne reported that she had been doing well, and it was reported that she appeared to be stable. (R. at 327.) That same day, Dr. Turnbull noted that Osborne requested pain medication. (R. at 326.) Dr. Turnbull saw no evidence of depression, elation or thought disorder. (R. at 326.) On December 31, 2007, Dr. Turnbull reported that he saw no evidence of either depression or elation. (R. at 370.) Osborne's thinking was logical, coherent and goal-directed with no evidence of a thought disorder. (R. at 370.)

On January 28, 2008, Osborne reported that she was doing well. (R. at 366.) She reported that she had not been able to look for a job because she had no transportation. (R. at 366.) Easterling reported that Osborne appeared to be stable. (R. at 366.) On February 7, 2008, Osborne reported that her mood was better, she denied hallucinations and stated that she was sleeping well. (R. at 408.) It was reported that Osborne appeared to be stable. (R. at 408.)

On April 3, 2008, Osborne reported that she had finished a temporary job that went well, but had been able to work only one day a week due to transportation issues. (R. at 399.) On April 8, 2008, Osborne reported that she was

---

(American Psychiatric Association 1994).

[5] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

taking her medications without side effects, and Easterling found her euthymic, well-groomed, friendly and cooperative. (R. at 397.) Osborne made good eye contact, presented no evidence of psychosis and had clear, coherent and goal-directed speech. (R. at 397.) Dr. Jennifer Wisdom-Schepers, M.D., similarly found Osborne calm, cooperative, well-groomed and euthymic. (R. at 395.) Osborne presented with no symptoms of psychosis or change in cognitive function, had normal speech and psychomotor activity, provided adequate answers to questions, actively participated in treatment discussions, made good eye contact, established a good rapport and was appropriate in behavior and mannerisms. (R. at 395.) Osborne stated that she was "doing much better" since taking her medication and that she had been working at a temporary job as a hostess. (R. at 395.) On May 5, June 10, July 17, August 12, 2008, Easterling reported normal objective observations of Osborne's mental status. (R. at 391, 528, 539, 542.) On September 19, 2008, Easterling reported that there was no evidence of psychosis and that Osborne appeared to be psychiatrically stable. (R. at 523.)

On January 28, 2009, Osborne called Easterling after she and her mother had an argument. (R. at 501.) Osborne reported that she had consumed 11 beers and threatened to harm herself. (R. at 501.) Easterling sought an emergency commitment order. (R. at 501-02.) Osborne, however, did not meet the criteria for hospitalization. (R. at 499.) Prior to an assessment of Osborne's mental status, a breath test showed that she had 0.3 blood alcohol content. (R. at 499.) When Easterling followed up with Osborne on January 29, 2009, Osborne had fine grooming and hygiene, friendly and appropriate interactions, euthymic mood, unremarkable speech and no evidence of psychosis. (R. at 498.) On February 6, 2009, Jennifer Boggs, M.S.N., documented generally normal objective

-9-

observations of Osborne and noted that Osborne reported "doing fairly well," but was upset and embarrassed over her recent alcohol relapse. (R. at 495.) Boggs documented a generally normal mental status examination, with Osborne making good eye contact, establishing good rapport, behaving appropriately, conversing easily and providing adequate answers to questions. (R. at 493.) On March 5, 2009, and April 3, 2009, Osborne reported that she was doing well, and it was reported that Osborne was psychologically stable. (R. at 487, 492.)

On May 7, 2009, Osborne became upset with a staff member at Frontier Health when completing intake for a DUI-related class. (R. at 482-83.) Her step-father told Easterling that Osborne was consuming alcohol "all the time." (R. at 481.) On May 18, 2009, a Frontier Health staff member noted that Osborne apologized for her actions at the intake and was euthymic with appropriate grooming. (R. at 478.) Osborne also reported that she was doing well. (R. at 477.) On May 26, June 2, and June 9, 2009, Osborne reported that she was doing well. (R. at 471, 474-75.) On August 25, 2009, Osborne reported that everything in her life was going well. (R. at 606.) She reported that she walked four miles a day and did 40 sit-ups a day. (R. at 606.) On September 29, 2009, Osborne stated that she was well and that she was trying to walk five miles a day. (R. at 593.) In October 2009, Osborne reported that she was doing well. (R. at 588, 592.) On November 24, 2009, Osborne stated that she may try to find work once she got her license back, as she had been denied disability. (R. at 582.) Boggs reported that Osborne presented without symptoms of psychosis and showed no change in cognitive function. (R. at 582.) On January 19, 2010, Osborne stated she was doing well. (R. at 579.)

On April 3, 2008, Louis Perrott, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Osborne suffered from a nonsevere affective disorder and anxiety-related disorder. (R. at 375-88.) Perrott reported that Osborne had no restriction on her activities of daily living. (R. at 385.) He reported that Osborne had mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 385.) Perrott also reported that Osborne had not experienced any episodes of decompensation. (R. at 385.)

On April 7, 2008, Dr. Frank M. Johnson, M.D., a state agency physician, reported that Osborne had no severe physical impairment. (R. at 389.)

On June 10, 2008, Osborne sought treatment at Kingsport Medical Center for stomach pain and chest pain. (R. at 460-61.) On physical examination, her neck was supple and freely movable, she had regular heart rate and rhythm and a normal abdominal examination, normal extremity range of motion and normal reflexes. (R. at 459.) An ECG also was normal. (R. at 464-65.) On February 12, 2009, Osborne complained of neck pain, but a cervical spine x-ray was normal. (R. at 463.)

On July 25, 2008, E. Hugh Tenison, Ph.D., a state agency psychologist, completed a PRTF indicating that Osborne suffered from a nonsevere affective disorder and anxiety-related disorder. (R. at 414-27.) Tenison reported that Osborne had no restriction on her activities of daily living. (R. at 424.) He reported that Osborne had mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 424.) Tenison also reported that Osborne had not experienced any episodes of decompensation. (R. at 424)

-11-

On July 28, 2008, Dr. Richard Surrusco, M.D., a state agency physician, reported that Osborne had no severe physical impairment. (R. at 428.)

On August 26, 2009, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Osborne at the request of Disability Determination Services. (R. at 544-51.) The Minnesota Multiphasic Personality Inventory-2 test, ("MMPI-2"), was performed, and Lanthorn noted that "[t]he results of her validity scales were so extreme that the examiner chose not to present a clinical interpretation of her test results." (R. at 550.) Lanthorn diagnosed bipolar I disorder; panic disorder without agoraphobia; alcohol dependence, in early remission; rule out somatization disorder, not otherwise specified; borderline intellectual functioning; and personality disorder, not otherwise specified. (R. at 550.) Lanthorn assessed Osborne's then-current GAF score at 55. (R. at 550.) Lanthorn reported that Osborne had mild limitations in her ability to learn simple and moderately simple tasks and in her ability to focus, concentrate and persist at tasks. (R. at 551.) He reported that Osborne would have mild to moderate difficulties in her ability to interact with others in a work setting and in dealing with the changes and requirements of the workplace. (R. at 551.)

Lanthorn completed a mental assessment indicating that Osborne had slight limitations in her ability to interact appropriately with the public and with supervisors. (R. at 552-54.) He indicated that Osborne had a satisfactory ability to understand, remember and carry out complex instructions, to make judgments on complex work-related decisions, to interact appropriately with co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 552-53.)

-12-

*III. Analysis*

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2011); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2011).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003, West 2011 & Supp. 2011); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Osborne argues that the ALJ erred by failing to find that she meets the

-13-

criteria for the listing for mental retardation, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(C).[6] (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 9-14.) Osborne also argues that the ALJ's residual functional capacity determination is not supported by substantial evidence. (Plaintiff's Brief at 14-17.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if she sufficiently explains her rationale and if the record

---

[6] Osborne did not allege mental retardation as one of her disabling impairments in her Disability Report. (R. at 209.)

supports her findings.

Osborne argues that the ALJ erred by failing to find that she meets the medical listing for mental retardation, found at § 12.05(C). For the following reasons, I disagree. The regulations explain that a claimant may not meet the mental retardation listing unless her "impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria…." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A (2011). The introductory paragraph states that "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2011).

To qualify as disabled under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(C), a claimant's condition must meet two requirements: (1) a valid verbal, performance or full-scale IQ score of 60 through 70 and (2) a physical or other mental impairment imposing additional and significant work-related limitation of function. The Secretary's regulations do not define the term "significant." However, this court previously has held that it must give the word its commonly accepted meanings, among which are, "having a meaning" and "deserving to be considered." *Townsend v. Heckler*, 581 F. Supp. 157, 159 (W.D. Va. 1983). In *Townsend*, the court also noted that the antonym of "significant" is "meaningless." *See* 581 F. Supp. at 159. The regulations do provide that "where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in

-15-

conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)(6)(c) (2011); *see Flowers v. U.S. Dep't of Health & Human Servs.*, 904 F.2d 211 (4th Cir. 1990).

While Osborne points to two reports from school psychologist Gibson, the only report that indicated that she had verbal and full-scale IQ scores in the mild mentally retarded range[7] was based on assessments conducted when Osborne was 11 years old. (R. at 430.) When Osborne was 16, and had attained an age at which her IQ score would have tended to stabilize, all of her IQ scores were in the borderline defective, not mentally retarded, range. (R. at 432.) The regulations provide parallel mental disorder listings for children. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00 (2011). In explaining the documentation required for a claimant to meet these listings, the regulations provide that "[g]enerally, the results of IQ tests tend to stabilize by the age of 16." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00D(10) (2011). Thus, "IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00D(10).

Lanthorn noted Osborne's school intelligence testing results, but ultimately opined that she was functioning in the borderline range of intellectual functioning. (R. at 545, 550.) Lanthorn opined that Osborne had mild limitations in her ability to learn simple and moderately simple tasks and in her ability to focus, concentrate and persist at tasks. (R. at 551.) He also found that Osborne would have mild to

---

[7] Mild mental retardation IQ scores fall between 50-55 to approximately 70. *See* DSM-IV at 40.

moderate difficulties in her ability to interact with others in the work setting and in dealing with the changes and requirements of the workplace. (R. at 551.) Lanthorn also completed a mental assessment indicating that Osborne had a satisfactory ability to understand, remember and carry out complex instructions, to make judgments on complex work-related decisions, to interact appropriately with co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 552-53.)

The ALJ found that the evidence indicated that Osborne's level of adaptive functioning was not in the range of mental retardation. (R. at 25.) In particular, the ALJ cited Osborne's past semi-skilled work as a CNA and the findings of Lanthorn. (R. at 25.) The regulations note that adaptive activities of daily living include "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C(1) (2011). Impaired social functioning may be exhibited by, "for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C(2) (2011). Lanthorn found that Osborne had adequate grooming and hygiene, (R. at 547), was able to recall four out of five words presented to her, correctly performed serial 7s, correctly interpreted two out of three adages, correctly spelled the word "world" both forward and backward, could immediately recall four digits forward and three digits backward and answered four out of five basic judgment skills correctly. (R. at 548.)

In her opinion, the ALJ also cited other evidence showing that Osborne did

-17-

not have deficits in adaptive functioning consistent with mental retardation. The ALJ referenced Osborne's September 13, 2007, appointment at Frontier Health where she was found friendly and appropriate. (R. at 24, 320.) The record is replete with similar observations from treating physicians, nurses and social workers. (R. at 322, 327, 366, 371, 391, 395, 397, 403, 408, 492, 498, 523, 528, 542.) The ALJ also noted that Osborne had reported working a temporary job that had gone well, participated in Bible study, shopped, did laundry, did housework and had no problems with personal care. (R. at 29, 31, 83-84, 242, 245, 399, 547.) The record also shows that Osborne had been able to drive and was taking alcohol safety classes to have her license restored after a second DUI. (R. at 69-74.) Osborne was repeatedly found to have logical, coherent and goal-directed thoughts. (R. at 321-22, 326, 366, 370-72, 397, 403, 408.) Examiners also consistently found that Osborne could answer questions appropriately, converse easily, establish a rapport and make eye contact. (R. at 395, 397, 403-04, 472, 493, 513, 517, 520, 526, 536, 540.) Osborne attended school for CNA training and worked as a CNA, semi-skilled work, for up to nine years. (R. at 67.) She was able to successfully complete CNA training while raising three children, one of whom was a toddler at the time. (R. at 67.) Based on this, I find that significant evidence exists to support the ALJ's finding that Osborne did not meet or equal the listing for §12.05(C).[8]

Osborne also argues that the ALJ's residual functional capacity determination is not supported by substantial evidence. (Plaintiff's Brief at 14-17.) Based on my review of the record, I find this argument unpersuasive. Records from Holston Valley show that Osborne complained of abdominal pain, but diagnostics

_____

[8] It is true that the evidence shows that Osborne was not successful in school. (R. at 256.) However, the lack of academic success does not equate with inability to function in life. Osborne did not leave school because of academic failure; she left because she was pregnant. (R. at 65.)

-18-

were ordered, and she ultimately had a normal upper endoscopy and normal abdominal MRI. (R. at 435, 439, 441, 446, 451, 454.) The records also document that Osborne reported an allergic reaction to a drug and complained of chest pain, but she had a normal chest x-ray, and her chest pain symptoms were ascribed to anxiety or a panic attack. (R. at 443-44, 448.) Records also show that Osborne's symptoms of anxiety and depression were controlled with medication. (R. at 325-27, 366, 370, 395, 408.)   "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

Records from Kingsport Medical Center show that Osborne complained of neck pain, but also document that she had a full range of motion in her cervical spine and had a normal cervical spine x-ray. (R. at 456, 463.) While these records also show that Osborne complained of abdominal and chest pain, they also included a normal ECG and physical examination. (R. at 459-60, 464-65.) The state agency physicians found that Osborne did not suffer from a severe physical impairment. (R. at 389, 428.) In fact, Osborne stated that she walked four to five miles a day and did 40 sit-ups a day. (R. at 593, 606.) Furthermore, she stated that since she had been denied disability, she wanted to find work. (R. at 582.) There is no documentation in the record to indicate that any physician ever placed physical limitations on Osborne's work-related activities. Based on this, I find that substantial evidence exists to support the ALJ's finding that Osborne had the physical residual functional capacity to perform a limited range of medium work.

Based on my review of the record, and for the above-stated reasons, I find that substantial evidence exists in the record to support the ALJ's findings as to

-19-

Osborne's mental and physical residual functional capacity.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists to support the Commissioner's finding that Osborne did not meet or equal the listing for §12.05(C);

2.  Substantial evidence exists to support the Commissioner's residual functional capacity finding; and

3.  Substantial evidence exists to support the Commissioner's finding that Osborne was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Osborne's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2011):

Within fourteen days after being served with a copy [of this Report

and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     May 22, 2012.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-21-